```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW MEXICO
 2                 No. 2:12-CV-0386-WPL-CG

 3   JAMES BURLESON,

 4          Plaintiff,

 5   vs.

 6   THE CITY OF ALBUQUERQUE;
     RAY SCHULTZ, Chief of Police; and
 7   BRANDON CARR; BRET LAMPHIRIS;
     LUKE LANQUIT; and DANIEL LOPEZ,
 8
            Defendants.
 9

10              DEPOSITION OF BRANDON CARR

11               February 6, 2013
                    1:24 p.m.
12              4908 Alameda, Northeast
             Albuquerque, New Mexico  87109
13

14

15

16      PURSUANT TO THE FEDERAL RULES OF CIVIL
     PROCEDURE this deposition was:
17

18
     TAKEN BY:  MR. STEPHEN K. KORTEMEIER
19              Attorney for Plaintiff

20

21

22   Reported by:  Robin A. Brazil, RPR, CCR #154
                   Kathy Townsend Court Reporters
23                 110 Twelfth Street, Northwest
                   Albuquerque, New Mexico  87102
24

25
```

```
 1                    A P P E A R A N C E S

 2    For the Plaintiff:

 3         DESCHAMPS & KORTEMEIER LAW OFFICES, P.C.
           Attorneys at Law
 4         P.O. Drawer 389
           Socorro, New Mexico  87801
 5         BY:  STEPHEN KARL KORTEMEIER
                (575) 835-2222
 6              skortlaw@ownmail.net

 7    For Defendant Carr:

 8         YENSON, ALLEN & WOSICK
           Attorneys at Law
 9         4908 Alameda, Northeast
           Albuquerque, New Mexico  87109
10         BY:  MR. MICHAEL S. JAHNER
                (505) 266-3995
11              mjanher@ylawfirm.com
      For Defendants City of Albuquerque, Schultz, Linguit and
12    Lampiris-Tremba:

13         CITY OF ALBUQUERQUE
           Legal Department
14         One Civic Plaza
           Fourth Floor
15         Albuquerque, New Mexico  87102
           BY:  MS. KRISTIN J. DALTON
16              (505) 768-4500
                kdalton@cabq.gov
17

18

19

20

21

22

23

24

25
```

1          You indicated a double L with a circle around
2    it on Exhibit Number 2 as being the position that
3    Detective Languit was in.
4         A.   Yes, sir.
5         Q.   And you indicated a line coming off of that in
6    the direction of where you previously indicated either
7    Mr. Burleson or the chair was, is that correct?
8         A.   Yes, sir, towards --
9         Q.   As being the line of direction of travel of
10   Detective Languit?
11        A.   Yes, sir.
12        Q.   Okay.
13        A.   Everyone was just -- I can't tell you exactly
14   what everyone did.  Everyone was trying to calm him down
15   again, so Detective Lampiris can continue his
16   investigation.
17             And at some point in time, I don't remember
18   what happened, but Detective Languit grabbed one of
19   Jim's arms, and after he grabbed his arm, as did I, I
20   grabbed the other arm, his left arm -- so Detective
21   Languit would have grabbed the right arm, I grabbed the
22   left arm.
23        Q.   Let's stop there.
24        A.   Yes, sir.
25        Q.   I understood what you're telling me is that

1   Detective Languit made the first grab toward
2   Mr. Burleson.  Is that correct?
3       A.   If I remember correctly, yes, sir.
4       Q.   Okay.  Well, that is the way you remember it?
5       A.   Yes, sir.
6       Q.   And I want to make sure we're clear on this
7   part.
8            You did not grab for Mr. Burleson until after
9   Detective Languit grabbed Mr. Burleson?
10      A.   Yes, sir.
11      Q.   Okay.  What happened after that?
12      A.   Once myself and Detective Languit both had an
13  arm -- I don't remember what Mr. Burleson was saying at
14  that point.  It was just, "Let's just calm this down."
15           This happens quite frequently in police work
16  when somebody, for whatever reason, gets agitated.
17  Sometimes it's best just to de-escalate the situation,
18  and one excellent way of doing that is if you put
19  handcuffs on the person, sit them down and talk to them
20  in a normal manner.  Sometimes it -- it has a great
21  effect.  It does calm the situation down.
22      Q.   And let me stop you there.
23           And is that what you're trained to do as a way
24  of de-escalating a situation?
25      A.   That's what we're trained to do in the event

1  of officer safety. If myself or any other officer feels
2  at any point in time they're about to be injured or
3  attacked or they're not having safe cooperation from
4  someone that we're interacting with, then you -- you are
5  taught to put handcuffs on somebody to preserve your
6  safety.
7       Q.   And this determination of the need to preserve
8  your safety, are you taught that that's strictly a
9  subjective determination?
10      A.   Absolutely subjective.
11      Q.   If I'm a police officer and I decide right
12 here and right now that you're a threat to my safety,
13 then I've been trained to jump across the table and put
14 the handcuffs on you?
15           MS. DALTON:  Object to form.
16           MR. JAHNER:  Join.
17      A.   Within reason.
18      Q.   Where does the "within reason" part come in?
19      A.   The fact that the responses we're getting out
20 of Mr. Burleson were combative.
21      Q.   To what extent were they combative?
22           MS. DALTON:  Object to form.
23           MR. JAHNER:  Join.
24           Go ahead.
25      A.   Just noncompliance.

1    Q.   What's the difference between noncompliance
2    and combative?
3         MS. DALTON:  Object to form.
4         MR. JAHNER:  Join that.
5    A.   Can you ask me that again?  I'm sorry.
6    Q.   What's the difference, in your mind, between
7    noncompliant and combative?
8         MS. DALTON:  Same objection.
9         MR. JAHNER:  Yeah, I join.  I'm --
10   A.   I'm not sure how to answer that one.
11   Q.   Well, these are words you used as apparently
12   synonymous, meaning the same thing.
13   A.   Yes, sir.
14   Q.   To me, they don't mean the same thing.  Do
15   they mean the same thing to you?  If somebody is
16   noncompliant, that means automatically they're
17   combative?
18   A.   They're passive-aggressive combative.
19   Q.   What does that mean?
20   A.   That's a -- means that by noncomplying they
21   are being aggressive in their own manner of
22   noncompliant.  If they are not complying, then they're
23   resisting.  If they're resisting, how can you feel safe
24   in a --
25   Q.   The words you used was that if they're

1  that mischaracterizes.  We went to general, away from
2  dealing with this situation.
3          Go ahead.  I don't think there's actually a
4  question.
5     Q.   I'm trying to understand, in your use of the
6  terms in your answers to my questions, that when you say
7  noncompliant that that is the equivalent, in your mind,
8  to being aggressive.
9     A.   Equivalent, no, sir.  I would not say that's
10 equivalent.  I would say it's a form of aggression.
11 Whether passive or active aggression, it's nonetheless a
12 form of aggression.
13         In the same manner -- I'm trying to think of a
14 good example.  By being noncompliant, you are being
15 aggressive.
16    Q.   Noncompliance is aggression?
17         MR. JAHNER:  Form.
18    A.   Yes, a form of aggression.
19    Q.   And it's a form of aggression which, as I
20 understand your testimony, you've been trained that the
21 appropriate response to that is to put somebody in
22 handcuffs?
23         MR. JAHNER:  Object to the form.
24         MS. DALTON:  Join.
25    Q.   Did I misunderstand your testimony on that?

1      A.   No -- yes and no.  Everything is definitely
2  based on the situation.  There's a lot of moving pieces
3  there that determines whether or not you should place
4  handcuffs on someone.
5           For instance, the proximity of Mr. Burleson
6  and myself, the small area in the office, there's many
7  different factors.  Size is a factor.  Mr. Burleson is a
8  bigger man than me or -- there's multiple reasons to do
9  this, but generally it is to -- it's been used -- or I
10 have used it as a de-escalation technique, as have many
11 other officers.
12     Q.   At any time during this interchange with
13 Mr. Burleson, did Mr. Burleson tell you to get out of
14 his office?
15     A.   No.
16     Q.   Do you think that a de-escalation technique
17 could have been for the officers to remove themselves
18 from the office?
19          MS. DALTON:  Object to form.
20          MR. JAHNER:  I join.
21     A.   No.
22     Q.   You don't think if the officers had left the
23 office that that would have de-escalated the situation?
24          MS. DALTON:  Objection.
25          MR. JAHNER:  Join.